UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| BLESI-EVANS COMPANY, | ) | CIV. 07-5061-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING MOTIONS FOR |
| vs. | ) | SUMMARY JUDGMENT |
| | ) | |
| WESTERN MECHANICAL | ) | |
| SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Blesi-Evans Company (Blesi), brought this action to recover

amounts due under a contract with defendant, Western Mechanical Services,

Inc. (Western). Blesi moves for summary judgment on its breach of contract

claim. Western has not responded to Blesi's motion, but moves for summary

judgment on its defenses that Blesi breached the parties' contract and that

Western is entitled to reduce Blesi's claim by the amount of the expenses

Western incurred as a result of Blesi's breach. Blesi opposes Western's motion.

**BACKGROUND**

The facts, as relevant to the pending motions,[1] are as follows: in the

spring of 2006, Western entered into a contract with the state of South Dakota

---

[1] On a motion for summary judgment, the nonmoving party is entitled to
the benefit of all reasonable inferences to be drawn from the underlying facts in
the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir.
1980). Because the court is considering both parties' motions for summary
judgment, the court states the undisputed facts and notes the disputed facts
without drawing reasonable inferences in favor of either party.

to replace the boilers on the South Dakota School of Mines and Technology (SDSM&T) campus. Skyline Engineering, LLC, acted as an agent for the state of South Dakota on this job. Under this contract, Western agreed to pay $500 per day in liquidated damages if the project was not substantially completed by October 13, 2006. Docket 58-6 at 4, 7, 14.

In February and March of 2006, Western solicited bids from subcontractors, including Blesi, for the boiler project. On March 14, 2006, Blesi submitted a proposal to supply one Superior Boiler Works Model W7-5-2500-S15-WBCF-GA2 Mohican Warrior, 4-pass wetback, 500 HP, Scotch Marine, steam boiler, along with freight costs, start-up, and training for $125,500. Docket 61-1 at 1-3. On March 28, 2006, Mike Guyse, Senior Application Engineer at Blesi, sent a fax to Western saying, "I am checking up to see what is happening with the School of Mines boiler project. Do you have your order yet? . . . PS: Deliveries are now into July for orders released this week. I also need to get this boiler on order to avoid an upcoming price increase." Id. at 4.

On April 6, 2006, Western faxed a purchase order to Blesi ordering one "Superior Boiler Works Model W7-5-2500-S15-WBCF-GA2 Mohican Warrior, 4-pass wetback, 500 HP, Scotch Marine, steam boiler" with the notation, "[p]er quote attached dated March 14, 2006." Docket 58-5 at 17. Western listed the price as $125,500. Id. Western attached a copy of the bid submitted by Blesi

on March 14, 2006, to the purchase order. Docket 58-5 at 18-20. Paul Jody Iseminger, president of Western, testified that Western accepted Blesi's proposal to sell the Superior boiler with the purchase order. Deposition of Paul Jody Iseminger (Iseminger Dep.), Docket 58-5 at 25-26.

Blesi ordered the boiler from the manufacturer, Superior Boiler Works, Inc. (Superior), on or about March 31, 2006, and requested that Superior release the boiler for production on April 6, 2006. Dockets 61-2 & 61-4. The owner and president of Blesi, Mark Evans, knew the boiler would be used to heat the SDSM&T campus. Deposition of Mark Evans (Evans Dep.), Docket 61-30 at 12.

The present dispute arises out of a delay in the production and delivery of the boiler. The parties dispute whether they agreed on a delivery date for the boiler. It is undisputed that neither Blesi's March 14, 2006, bid nor Western's purchase order contained an expected shipment or delivery date. Western's president testified that Blesi's proposal did not contain a proposed date of delivery and that Blesi had not confirmed a delivery date in writing at the time Western sent its purchase order. Iseminger Dep. at 26-27. Rick Gienapp, Western's project manager, testified that Western sent several of its subcontractors a contract form providing that the work must be completed by October 13, 2006. Deposition of Rick Gienapp (Gienapp Dep.), Docket 58-4 at 66; see also Docket 58-4 at 12 (contract between Western and Checker Electric,

Inc.).  Western did not send this subcontract form to Blesi.  Gienapp Dep. at 67.

An undated Superior document indicates that the boiler should be shipped to

the SDSM&T campus the week of September 30, 2006.  Docket 61-31 at 4.

After Blesi ordered the boiler from Superior, a series of emails, faxes, and

letters regarding the shipment and delivery dates for the boiler began.  Blesi

contacted Superior on April 28, 2006, to get information on the delivery date of

the boiler.  Docket 61-5.  Guyse testified that he checked with Superior to make

sure there was a firm delivery date for the boiler on this day.  Deposition of

David Michael Guyse (Guyse Dep), Docket 61-29 at 8.

On May 1, 2006, Blesi sent a fax to Western saying, "I have some **VERY**

bad news; delivery of your boiler has been pushed back to 9/23/06. . . .

Therefore, if you need to cancel this order I will regrettably understand."

Docket 61-6 (emphasis in original).  Blesi had confirmed the September 23,

2006, delivery date with Superior.  Guyse Dep. at 10.  Also on May 1, 2006,

Western sent a letter to Skyline informing Skyline that the shipment date of the

boiler had been pushed out until "approximately September 23, 2006."  Docket

58-6 at 16.  Western explained that it had "contacted various boiler

manufacturers and they are all experiencing delivery times of the same

magnitude."  Id.  Western requested an extension of the completion date for the

SDSM&T project and relief from the liquidated damages penalty of the contract,

stating, "**IF** the boiler arrives around September 23rd as estimated, that only

leaves us about 2 ½ weeks to set the equipment, connect it and do the factory start up." Id.

On May 4, 2006, Skyline denied Western's requests for an extension and relief from the liquidated damages provision of the contract. Skyline stated, "the State expects a fully functional boiler to be installed and online at the physical plant by the scheduled completion date of October 13, 2006. . . . If reasonable assurance of an on time project delivery cannot be made, the State will pursue damages." Docket 61-7. That day, Western wrote a letter to Blesi informing Blesi that Skyline and the State Engineer were adamant that the project be completed by October 13, 2006. Western requested,

> p]lease contact the factory and see if there is anything we can do to expedite this. . . . [T]he State Engineer is asking for reassurance that we can complete this project on time. We need an immediate response from you on a locked in delivery date that we can forward to Skyline and the State Engineers office before they will allow us to start removal of the existing boiler.

Docket 61-8. Western also reminded Blesi that the $500 per day liquidated damages would add up quickly. Blesi, in turn, informed Superior that Western would face liquidated damages if the boiler was delivered after the scheduled delivery date. Evans Dep. at 38. Superior indicated that it firmly believed it would meet the scheduled delivery date and would try to improve on it. Docket 61-9. Western asserts that Blesi passed on Superior's statement to Western, but Blesi asserts that nothing in the record documents such a correspondence.

On May 5, 2006, Western informed Skyline that Western had been in contact with Blesi about the delivery date of the boiler. Western reported that boiler delivery dates had been extended from 16-20 weeks to 24 or more weeks. Western indicated that it had requested that Superior forward a definite delivery date to Western. Western also stated that "[p]roviding the factory can supply the boiler to us prior to September 23rd, as stated, we guarantee we will be able to have the equipment up and functioning by the October 13th completion date." Docket 58-4 at 10.

On May 15, 2006, Western faxed a letter to Skyline stating that Western would provide, furnish, and maintain a temporary boiler at its own cost if the temperatures required and the boiler did not arrive on schedule. Docket 61-11. Western asserts that Skyline demanded that Western agree to provide a temporary boiler if the boiler did not arrive on time. Blesi disputes that Skyline ever demanded that Western provide a temporary boiler.

On July 25, 2006, Blesi informed Western that "[s]hipment of your boiler for the School of Mines project is still 9/28/06" and indicated that Blesi hoped the date would be even earlier. Docket 61-11.

On September 14, 2006, Blesi corresponded with Superior about the boiler. Superior stated that it could not remember a guarantee date for shipment of the boiler and would get back to Blesi when its engineering department knew when it would begin the cutting phase for the boiler. Docket

61-12. On September 15, 2006, Blesi informed Western that the boiler was scheduled to be delivered on November 3, 2006. Blesi acknowledged, "[t]his is obviously not acceptable and Superior Boiler Works has been working the past several days to see what they can do to improve this delivery date." Docket 61-13. On September 18, 2006, apparently after discussions between Blesi and Western, Blesi informed Superior that Western was facing expenses of $6,000 per month to rent a temporary boiler, $3,000 in freight charges, and $3,000 to install the temporary boiler. Blesi indicated that these expenses were in lieu of the $500 per day fine Western would otherwise face. Docket 61-14.

On October 5, 2006, Skyline wrote a letter to Western stating that the contract for the SDSM&T project provided that the work would be substantially completed by October 13, 2006, and there would be liquidated damages in the amount of $500 per calendar day for delay in completion of the work. Skyline referred to Western's May 15, 2006, letter indicating that Western would furnish a temporary boiler if the boiler did not arrive on schedule and stated, "[t]his letter serves as formal notification that a temporary boiler, equal in size and burner efficiency to the project boiler shall be installed and maintained at your cost until the new boiler has been installed and is in operational condition." Docket 61-15. On October 10, 2006, Western notified Skyline that the temporary boiler would arrive on October 13, 2006, and would be operational, if

needed, by October 24, 2006.  Docket 61-17.  The temporary boiler was delivered to the SDSM&T campus on October 14, 2006.  Docket 64-1.

On October 18, 2006, Blesi informed Superior that Western had to rent a temporary boiler because of Superior's delays.  Blesi requested that Superior write a letter explaining and apologizing for the delays.  Docket 61-18.  On October 20, 2006, Blesi again contacted Superior and stated that Blesi would not continue to lie and cover for Superior.  Blesi asked how many other boiler orders came in after Blesi's but were constructed before the boiler for the SDSM&T project and requested a " **'REAL'** ship date, not a wish date."  Docket 61-19.

On October 23, 2006, Blesi informed Western that the delivery date for the boiler had been pushed back to December 9, 2006.  Blesi indicated that its owner and president could not take the delays any longer and was flying to Kansas to see what was happening at the Superior factory.  Docket 61-20.  Evans did travel to Kansas to talk with the president and sales manager of Superior about the delivery date of the boiler.  Evans Dep. at 12.

The boiler was delivered to the SDSM&T campus on or about December 7, 2006, but due to shortcomings in the boiler's construction, it was not up and running until January of 2007.

After the boiler was up and running, Blesi sent Western an invoice for $140,078.68 for the boiler and related work.  Docket 58-5 at 29.  Western has

not paid any monies on this invoice, but sent its own invoice to Blesi for $119,340.88, which represented all of the costs Western incurred in installing, maintaining, and returning the temporary boiler due to Blesi's failure to deliver the boiler as promised.

Blesi brought suit against Western on August 30, 2007, alleging that Western's failure to pay Blesi for the boiler and related services and materials constituted a breach of Western's contractual obligations to Blesi.  Western denied Blesi's allegations and raised the affirmative defenses that Blesi breached its contractual obligations when it failed to provide the boiler by September 23, 2006, causing Western to cover the breach by obtaining a temporary boiler, and that all of Blesi's damages were caused by Superior's failure to deliver the boiler by September 23, 2006.  Now both parties move for summary judgment on their claims.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

**DISCUSSION**

**I.    Breach of Contract**

Blesi and Western both move for summary judgment on their claims that the other party breached the contract. Blesi alleges that Western breached the contract by failing to pay for the boiler after Blesi delivered it. Western alleges that Blesi breached the contract by failing to deliver the boiler by the agreed-upon delivery date of September 23, 2006, or September 28, 2006. In this diversity case, the court applies the substantive law of South Dakota. See

General Elec. Capital Corp. v. Union Planters Bank, 409 F.3d 1049, 1053 (8th Cir. 2005) ("In diversity cases, we apply the substantive law of the state in which the district court sits."). Under South Dakota law, "[i]n contracts for the sale of goods, a general precept exists which states that the seller must make timely delivery and transfer goods to the buyer, while the buyer has a duty to accept the goods and pay the seller." Atwood-Kellogg, Inc. v. Nickeson Farms, 602 N.W.2d 749, 752 (S.D. 1999); see also SDCL 57A-2-301. Thus, the present dispute comes down to whether Blesi was obligated to deliver the boiler by a certain date under the contract. If Blesi delivered the boiler on time, then Western breached the parties' contract by failing to pay for the boiler. But if Blesi did not deliver the boiler on time, then Blesi breached the parties' contract.

As an initial matter, the court determines which body of law governs the contract dispute in this case and, as a result, provides the rules for determining when Blesi was obligated to deliver the boiler under the parties' contract. Article 2 of the Uniform Commercial Code (UCC), codified at SDCL 57A-2, governs transactions in goods. City of Lennox v. Mitek Indus., Inc., 519 N.W.2d 330, 332 (S.D. 1994); see also SDCL 57A-2-102. "Goods" are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." SDCL 57A-2-105(1). Here, the boiler

was clearly movable at the time it was identified to the parties' contract and thus falls within the definition of goods under the UCC.

Blesi also agreed to provide services in relation to the boiler, including start-up and training. When goods and services are sold together, Article 2 still governs the transaction if the predominant purpose of the contract was the sale of goods with labor incidentally involved rather than the rendition of a service with goods incidentally involved. Jandreau v. Sheesley Plumbing & Heating Co., Inc., 324 N.W.2d 266, 268-69 (S.D. 1982) ("The test for inclusion or exclusion is . . . whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." (quoting Bonebrake v. Cox, 499 F.2d 951, 960 (8th Cir. 1974)). Here, the court finds that the predominant purpose of the contract between Blesi and Western was the sale of the boiler, and the start-up and training services were incidentally involved. Indeed, Western's purchase order lists one "Superior Boiler Works Model W7-5-2500-S15-WBCF-GA2 Mohican Warrior, 4-pass wetback, 500 HP, Scotch Marine, steam boiler," but does not make reference to the start-up and training services aside from referring to Blesi's quote dated March 14, 2006. See id. (stating that court looks first to the language of the sales contract to determine the purpose). Further, the present dispute arose because Blesi did not provide

12

the boiler by a certain time, not because Blesi did not provide the related services. These facts suggest that the Blesi-Western transaction in all likelihood would not have taken place but for Western's need for and Blesi's agreement to sell the boiler. Thus, the court concludes that the agreement between Blesi and Western was predominantly a contract for the sale of goods and therefore is governed by Article 2 of the UCC. See City of Lennox, 519 N.W.2d at 332 (finding that contract was predominantly a contract for the sale of goods where the transaction would not have taken place but for the necessity of the goods).

Before determining the terms of Blesi and Western's contract, the court notes that Blesi and Western entered into a binding contract under the rules of contract formation in Article 2. Under Article 2, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." SDCL 57A-2-204(1). And, "[a]n agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined" and "[e]ven though one or more terms are left open . . . if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." SDCL 57A-2-204(2)-(3). Under these rules, the court finds as a matter of law that Blesi and Western entered into a contract for sale of the "Superior Boiler Works Model W7-5-2500-S15-WBCF-GA2 Mohican Warrior, 4-pass wetback, 500 HP, Scotch Marine, steam boiler," along with freight costs,

start-up, and training, for $125,500. It appears from the parties' statements of fact and briefs that both Blesi and Western agree that they entered into a contract with these terms. The contract does not fail because the parties dispute whether the contract included a term establishing the delivery date of the boiler. See SDCL 57A-2-201(1) ("A writing is not insufficient because it omits or incorrectly states a term agreed upon."); see also SDCL 57A-2-201 cmt. 1 (stating that the time and place of payment or delivery may be omitted from the writing required under the statute of frauds).[2]

Under Article 2, the parties may agree on a definite time for shipment or delivery. "Agreement as to a definite time . . . may be found in a term implied from the contractual circumstances, usage of trade or course of dealing or performance as well as in an express term." SDCL 57A-2-309 cmt. 1. In the absence of such an agreement, Article 2 provides that the time for shipment or delivery shall be a "reasonable time." SDCL 57A-2-309. "[R]easonable time . . . depends upon what constitutes acceptable commercial conduct in view of the nature, purpose, and circumstances of the action to be taken." SDCL 57A-2-309 cmt. 1. Further, Article 2 provides that the parties may modify their contract as the transaction progresses, and "[a]n agreement modifying a

---

[2] Under SDCL 57A-2-201, the "statute of frauds," a contract for the sale of goods for the price of $500 or more is not enforceable unless there is a writing signed by the party against whom enforcement is sought that is sufficient to indicate that a contract for sale has been made. Neither party alleges that the statute of frauds is not satisfied in this case.

contract . . . needs no consideration to be binding." SDCL 57A-2-209(1).[3] The purpose of this rule is to allow the parties to make "all necessary and desirable modifications of sales contracts without regard to the technicalities which at [common law] hamper such adjustments." SDCL 57A-2-209 cmt. 1.

Here, there are disputed issues of material fact regarding whether Blesi and Western agreed on a definite time for delivery of the boiler. It is undisputed that neither Blesi's March 14, 2006, bid nor Western's purchase order contained an expected or definite shipment or delivery date. It is also undisputed that Blesi had not confirmed a delivery date in writing at the time Western sent its purchase order to Blesi. But under SDCL 57A-2-309, evidence of an agreement as to a definite date of delivery can be found in the contractual circumstances and course of performance as well as in an express written term. On May 1, 2006, Blesi sent a fax to Western saying that the delivery date of the boiler had been pushed back to September 23, 2006. This fax may suggest that the parties had previously reached an oral agreement as to an earlier delivery date[4] or that on May 1, 2006, the parties agreed that the delivery date would be September 23, 2006. On the other hand, Western informed Skyline that "if" the boiler arrived on September 23, 2006, "as estimated," Western would have a

---

[3] A modification must satisfy the statute of frauds if the contract as modified is within the provisions of the statute of frauds. SDCL 57A-2-209(3).

[4] Oral evidence regarding a previous oral agreement is subject to the parol evidence rule, as discussed in more detail later in the section.

limited time to set up the equipment. Western's use of conditional language may suggest that Blesi and Western had not agreed on a definite delivery date. The May 1, 2006, correspondence creates a factual question regarding whether the parties agreed on a definite delivery date of the boiler either at the time of contracting or through a subsequent modification. Similarly, Blesi's July 25, 2006, fax to Western stating that shipment of the boiler was still scheduled for September 28, 2006, may or may not indicate that the parties agreed on this date for the delivery of the boiler. And Blesi's September 15, 2006, letter to Western stating that the boiler was scheduled for a November 3, 2006, delivery date and acknowledging that this date was not acceptable may suggest that the parties had agreed on an earlier delivery date for the boiler. Overall, there are disputed issues of material fact relating to the question of whether Blesi and Western agreed on a definite delivery date for the boiler and incorporated this date into their contract. As a result, the terms of the contract are uncertain and neither party is entitled to judgment as a matter of law that the other party breached the contract.

Blesi asserts that the parties' correspondence is inadmissible to show that Blesi and Western agreed on a delivery date for the boiler because the parol evidence rule bars extrinsic evidence of the parties' intent where the language of the written contract is unambiguous. But Blesi's formulation of the parol evidence rule, which applies to cases that do not fall within Article 2 of the UCC,

see In re J.D.M.C., 739 N.W.2d 796, 806 (S.D. 2007), does not reflect the parol

evidence rule under the UCC.  Under Article 2,

> [t]erms with respect to which the confirmatory memoranda of the
> parties agree or which are otherwise set forth in a writing intended
> by the parties as a final expression of their agreement with respect
> to such terms as are included therein may not be contradicted by
> evidence of any prior agreement or of a contemporaneous oral
> agreement but may be explained or supplemented (a) [b]y course of
> performance, course of dealing, or usage of trade (§ 57A-1-103);
> and (b) [b]y evidence of consistent additional terms unless the court
> finds the writing to have been intended also as a complete and
> exclusive statement of the terms of the agreement.

SDCL 57A-2-202.  It is well established that "[g]eneral principles of law will not

be applied where they conflict with particular provisions of the UCC."  Arcon

Constr. Co., Inc. v. South Dakota Cement Plant, 349 N.W.2d 407, 412

(S.D.1984); see also SDCL 57A-1-103(b).  Article 2 "definitely rejects . . . [t]he

requirement that a condition precedent to the admissibility of [evidence of

course of performance, course of dealing, or usage of trade] is an original

determination by the court that the language used is ambiguous."  SDCL 57A-2-

202 cmt. 1(c).  Thus, Blesi's argument that evidence of the parties'

correspondence is inadmissible because the language of Blesi's March 14, 2006,

bid and Western's purchase order is unambiguous is unavailing.

Moreover, "[t]he parol evidence rule does not apply to evidence of

*subsequent* agreements or modifications."  1 James J. White & Robert S.

Summers, Uniform Commercial Code (5th ed.), § 2.10; see also SDCL 57A-2-202

(providing that writing intended as final expression of agreement "may not be contradicted by evidence of any **prior agreement** or of a **contemporaneous oral agreement**."). Western presents evidence that the parties discussed the delivery date of the boiler both orally and through faxes, emails, and letters **after** the bid and purchase order were exchanged. This evidence does not fall within the ambit of the parol evidence rule. Western has not proposed evidence of a "prior agreement" or "contemporaneous oral agreement" that would fall under Article 2's parol evidence rule. Thus, Blesi's argument that evidence of post-purchase order correspondence is barred by the parol evidence rule is unavailing. This evidence may show that the parties modified their contract to add a specific delivery date at some point after they exchanged the bid and purchase order. See SDCL 57A-2-209(1).

Further, even if Western's proposed evidence does fall under the parol evidence rule, the court cannot determine that such evidence is barred as a matter of law at this stage. Under the parol evidence rule, if the court finds that the parties intended the writing to be a complete and exclusive statement of the terms of their agreement, then oral evidence relating to contract terms is not admissible unless it is evidence of course of dealing, usage of trade, or course of performance offered only to explain or supplement the writing. SDCL 57A-2-202; see also Dakota Pork Indus. v. City of Huron, 638 N.W.2d 884, 886 (S.D. 2002) (holding that evidence of oral understanding regarding additional term is

not admissible where written contract intended to be complete and exclusive statement of agreement was silent on this term); 1 White & Summers § 2-10. But if the court finds that the parties did not intend the writing to be a complete and exclusive statement of the terms of their agreement, then oral evidence of "consistent additional terms" is admissible unless the court determines that "the additional terms are such that, if agreed upon, they would certainly have been included in the document." SDCL 57A-2-202 cmt. 3; see also 1 White & Summers § 2-9.[5]

In other words, the admissibility of evidence under the parol evidence rule hinges on the question of whether the parties intended the applicable writing to be a complete and exclusive statement of the terms of their agreement. The question of completeness and exclusivity is for the court. SDCL 57A-2-202(b); see also 1 White & Summers § 2-9. Here, the court cannot determine at this stage as a matter of law whether Blesi and Western intended the bid and purchase order to be a complete and exclusive statement of the terms of their agreement. Neither party has presented evidence of their intentions regarding the bid and purchase order or regarding any issues on which the writings are silent. "Usually a judge should . . . go beyond the four corners [of the writing]

---

[5] The parol evidence rule also provides that if the parties intended the writing to be a final expression of their agreement with respect to particular terms (rather than the agreement as a whole), then prior or contemporaneous evidence contradicting those terms is not admissible. 1 White & Summers § 2-10. This aspect of the parol evidence rule is not in play in this case.

and consider any proffered evidence on the issues of completeness and exclusivity. At minimum the judge must learn of the context and of the character of the terms not in the writing." 1 White & Summers § 2-10. Further, in some cases, "the judge may need evidence explaining the offered term, the relevant practice on comprehensiveness of writings and the reasons for exclusion of the term from the writing." Id. In the absence of such evidence, the court cannot determine that Blesi and Western intended the bid and purchase order to be a complete and exclusive statement of the terms of their agreement. Thus, Blesi's argument that it is entitled to summary judgment because evidence regarding an unwritten agreement on the delivery date for the boiler is inadmissible fails.

Finally, even if Blesi were to prevail on its argument that the parties' correspondence regarding the delivery date of the boiler is inadmissible to show that the parties agreed on a specific delivery date, there would still be an issue of fact for the jury. When a contract is silent on the time for shipment or delivery, Article 2 provides that the time "shall be a reasonable time." SDCL 57A-2-309. And "reasonable time . . . depends upon what constitutes acceptable commercial conduct in view of the nature, purpose, and circumstances of the action to be taken." SDCL 57A-2-309 cmt. 1. In light of the evidence that Blesi delivered the boiler as soon as Superior manufactured it, that Western contacted other boiler manufacturers that were all experiencing

delivery times around September 23, 2006, for new orders, that Western

informed Blesi that Western was required to have the boiler installed and

operational by October 13, 2006, and that Blesi acknowledged that the

November 3, 2006, estimated delivery date was not acceptable, in addition to

the other evidence in the record, the question of what is a "reasonable time" for

shipment or delivery in this case is a question of fact properly left to the jury.

See Superior Boiler Works, Inc. v. R.J. Sanders, Inc., 711 A.2d 628, 636 (R.I.

1998) ("In the usual case the question of what constitutes a reasonable time

under the UCC is one for the finder of fact to determine from the nature,

purpose, and the circumstances surrounding the transaction."); see also Hepper

v. Triple U Enters., Inc., 388 N.W.2d 525, 527 (S.D. 1986) (stating that jury was

adequately instructed on how to determine "reasonable time" under SDCL 57A-

1-204(2)).

Overall, in light of the many questions of fact for the jury relating to the

material terms of Blesi and Western's contract, neither Blesi nor Western is

entitled to judgment as a matter of law that the other party breached the

contract.

## II.      Western's Set-Off Defense

Western moves for summary judgment on its claim that if Blesi is entitled

to damages for breach of contract, then Western is entitled to reduce Blesi's

damages by the amount of the expenses Western incurred in renting, installing,

and removing the temporary boiler as a result of Blesi's breach of the parties' contract.

## A.    Waiver

Blesi argues that Western waived this "set-off" defense by failing to plead it as an affirmative defense or counterclaim.  Under Rule 8(c) of the Federal Rules of Civil Procedure, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."  Fed. R. Civ. P. 8(c). Generally, failure to plead an affirmative defense results in waiver of that defense.  First Union Nat'l Bank v. Pictet Overseas Trust Corp., Ltd., 477 F.3d 616, 622 (8th Cir. 2007).  But "the Rule 8(c) pleading requirement is intended to give the opposing party both notice of the affirmative defense and an opportunity to rebut it."  Id.  Thus, the Eighth Circuit has "eschewed a literal interpretation of the Rule that places form over substance."  Id.  "When an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply with Rule 8(c) is not fatal." Id. (internal quotation omitted).

Here, Western explicitly alleged two affirmative defenses in its Answer. First, Western stated,

> Defendant Western alleges as an affirmative defense that Plaintiff
> Blesi breached its agreement when it failed to provide the boiler by
> September 23, 2006, as it had promised and that Defendant
> Western covered that breach by obtaining a rental unit until the
> proper boiler could be delivered, which rental and installation of the

temporary unit required replumbing and significant labor and
materials by Defendant Western and additional replumbing, labor,
and materials when the proper unit was delivered.

Answer of Western Mechanical Service, Inc., Docket 6 at ¶ 7. Second, Western

stated,

Defendant Western alleges as a separate affirmative defense that all
damages claimed by Plaintiff Blesi were caused by Plaintiff Blesi's
supplier's (Superior Boiler Works) failure to deliver the boiler on
time by September 23, 2006. The damages claimed by Plaintiff
Blesi were caused by its supplier, Superior Boiler Works, who
should be responsible to Plaintiff Blesi for any damage suffered.

Id. at ¶ 8. As Blesi points out, Western did not explicitly state that it was

entitled to a set-off or a reduction in Blesi's claimed damages in the paragraphs

denominated as "affirmative defenses." But earlier in its answer, Western set

out its claim for a reduction in Blesi's damages:

Defendant Western acknowledges that it has not paid Plaintiff Blesi
any monies because those funds were consumed in the change-out,
modifications, installation, and rental of the temporary boiler, and
removal of the temporary boiler and modifications and installation
of the proper boiler as a result of Plaintiff Blesi's breach of its
contractual obligation to deliver the boiler on time.

Id. at ¶ 5.

Assuming without deciding that Western's set-off defense is an affirmative

defense subject to Rule 8(c)'s pleading requirement,[6] the court finds that

---

[6] In a diversity action, whether a defense is an affirmative defense is a
question of state law. First Union, 477 F.3d at 621-22. Under South Dakota
law, "[t]he buyer on notifying the seller of his intention to do so may deduct all
or any part of the damages resulting from any breach of the contract from any
part of the price still due under the same contract." SDCL 57A-2-717. The

Western's technical failure to state this defense under the heading of an "affirmative defense" is not fatal. The answer taken as a whole gives Blesi adequate notice of Western's defense and an opportunity to rebut it, fulfilling the purposes of the Rule 8(c) pleading requirement. In paragraph 7, which sets out Western's first affirmative defense, Western alleged that it had to "cover" Blesi's breach by obtaining a temporary boiler. This allegation gives Blesi notice that Western seeks to avoid full liability for Blesi's claimed damages based on the expenses Western incurred as a result of Blesi's conduct. Further, in paragraph 5, Western alleged that the money it owed Blesi for the boiler was consumed by the expenses Western incurred in installing and renting the temporary boiler as a result of Blesi's breach of its contractual obligation to deliver the boiler on time. Based on these paragraphs, the court finds that Western raised its set-off defense in its answer in a manner that has not resulted in unfair surprise to Blesi. Blesi has not shown that it did not have notice that Western seeks a reduction in Blesi's damages based on the expenses Western incurred in relation to the temporary boiler, nor has Blesi shown that the lack of clarity in Western's allegations has prejudiced Blesi's ability to respond. In the absence of a showing of prejudice or unfair surprise to Blesi,

---

buyer may assert its damages under this provision as an affirmative defense to an action brought by the seller for the purchase price. 1 James J. White & Robert S. Summers, Uniform Commercial Code § 10-2 n.2 (5th ed.) (citing § 2-717 of the Uniform Commercial Code).

the court finds that Western's technical failure to comply with [Rule 8(c)](#) is not fatal.  See [First Union, 477 F.3d at 622](#).[7]  And there is no authority to suggest that Western was required to raise this defense as a counterclaim under Rule 13.  Thus, Western did not waive its set-off defense.

**B.    Summary Judgment**

Western, however, is not entitled to summary judgment on this defense because there are disputed issues of material fact relating to the terms of the parties' contract, and consequently, the question of whether either party breached the contract.  Western is not entitled to a "set off" as a matter of law.

Article 2 provides that "[t]he buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."

[SDCL 57A-2-717](#).  "This section permits the buyer to deduct from the price damages resulting from any breach by the seller."  [SDCL 57A-2-717](#) cmt. 1. "The buyer, however, must give notice of his intention to withhold all or part of the price . . . [but] no formality of notice is required and any language which

---

[7] Even if Western's answer did not sufficiently provide Blesi with notice of and an opportunity to rebut Western's set-off defense, the court would find that Western's explicit assertion of this defense in its motion for summary judgment is sufficient to avoid waiver of the defense.  See [Stoebner v. Parry, Murray, Ward & Moxley, 91 F.3d 1091, 1093-94 (8th Cir. 1996)](#) (per curiam) (finding that absent prejudice or lack of notice, affirmative defense may be raised for first time in summary judgment motion).  Under the facts of this case, Blesi would not be prejudiced by allowing Western to explicitly raise its set-off defense for the first time in its motion for summary judgment.

reasonably indicates the buyer's reason for holding up his payment is sufficient." SDCL 57A-2-717 cmt. 2. Further, under SDCL 57A-2-712(1), if the seller has failed to make delivery or has repudiated the contract, or if the buyer has rightfully rejected or justifiably revoked its acceptance of the goods, then "the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." SDCL 57A-2-711(1); SDCL 57A-2-712(1). If the buyer satisfies these requirements, "the buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages . . . but less expenses saved in consequence of the seller's breach." SDCL 57A-2-712(2). Whether Western is entitled to a "set-off" under these provisions depends on disputed facts—including whether Western provided sufficient notice to Blesi, whether Blesi failed to make delivery in accordance with the contract, whether Western rightfully rejected or justifiably revoked its acceptance of the boiler, whether Western obtained the temporary boiler in good faith and without unreasonable delay, and whether the rental of the temporary boiler was intended as a substitute for the boiler ordered from Blesi—so the court cannot grant summary judgment on this defense.[8]

_____

[8] Western cites a series of South Dakota and non-South Dakota cases holding that the plaintiff in a breach of contract case is entitled to foreseeable consequential damages caused by the defendant's breach. None of these cases

**CONCLUSION**

Overall, there are disputed issues of material fact that preclude judgment in favor of Blesi on its claim that Western breached its obligations under the parties' contract. These disputed issues also preclude judgment in favor of Western on its defenses that Blesi breached its agreement to provide the boiler by a specific time and that Western is entitled to reduce Blesi's claim by the expenses Western incurred in renting a temporary boiler. Accordingly, it is hereby

ORDERED that plaintiff's motion for summary judgment (Docket 55) is denied.

IT IS FURTHER ORDERED that defendant's motion for summary judgment (Docket 59) is denied.

Dated April 13, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

---

applied the UCC, so it unclear whether they apply to this case, and all of the cases involved fact-specific determinations of whether the particular damages were appropriate in that case. These cases do not support Western's claim that it is entitled to a set-off of Blesi's damages as a matter of law.